WILDENSTEIN & CO., Plaintiff,

v.

Brent WALLIS, individually, in his capacity as president of the Hal B. Wallis Foundation, in his capacity as trustee of the Hal B. Wallis Trust and in his capacity as executor of the Estate of Hal B. Wallis, the Hal B. Wallis Foundations, the Hal B. Wallis Trust and the Estate of Harold (Hal) B. Wallis, Defendants.

No. 89 Civ. 3187 (MGC).

United States District Court, S.D. New York.

Feb. 13, 1991.

Shearman & Sterling by Jeremy G. Epstein, Joseph T. McLaughlin, Alan S. Goudiss, Maria A. Barton, New York City, for plaintiff.

Gold, Farrell & Marks by Martin R. Gold, Robert P. Mulvey, Lawrence A. Kanusher, New York City, for defendants.

OPINION AND ORDER

CEDARBAUM, District Judge.

This diversity case involves plaintiff Wildenstein & Co.'s claimed interest in important paintings in the collection of the late movie producer and director Hal B. Wallis. Wildenstein, an art dealer, obtained possession of two of these paintings, Monet's "Houses of Parliament" and Gaugin's "The Siesta—A Brittany Landscape," and resold

them to Wallis pursuant to a settlement agreement which is the subject of this lawsuit.

Defendants have moved (1) for leave to amend their answer to add the Rule Against Perpetuities as a defense, and for summary judgment based on that defense; (2) for partial summary judgment dismissing the complaint against the estate of Hal B. Wallis and against Brent Wallis as executor on the ground that plaintiff failed to file and preserve its claims in the California probate proceedings; and (3) for leave to add Shearman & Sterling as a defendant on their third counterclaim for breach of a confidentiality agreement. Plaintiff has moved for summary judgment to dismiss defendants' third counterclaim, arguing that there was no breach of a confidentiality agreement and that Shearman & Sterling should not be joined.

Since all of plaintiff's claims depend on the settlement agreement, if the settlement agreement is invalid, defendants are entitled to summary judgment dismissing all of plaintiffs' claims. For the reasons discussed below, defendants' motion for leave to amend their answer and for summary judgment is granted.[1]

### The Facts

The facts considered for purposes of defendants' motion for summary judgment are the undisputed facts and plaintiff's version of the remaining facts.

Hal B. Wallis was an avid collector of Impressionist and Modern works of art. Hal Wallis apparently gave several of these paintings to his wife, Martha Hyer Wallis.

According to the undisputed allegations of the complaint, Martha Hyer Wallis borrowed frequently from money lenders, and often used her property as security for these loans. In August 1980, Mrs. Wallis became acquainted with three confidence men, Harold Pruett, Gerhard Whiffen and Rory Keegan. In November 1980, Mrs. Wallis needed to borrow $1 million for an unknown purpose. Pruett, Whiffen and Keegan offered to assist her, and she apparently indicated a willingness to use some of her paintings as collateral. Some time in late November or early December 1980, Mrs. Wallis, without the knowledge of Mr. Wallis, delivered to Whiffen and Keegan Monet's "Houses of Parliament," Gaugin's "The Siesta—A Brittany Landscape," and two Remingtons to be pledged as collateral for loans, and executed a power of attorney authorizing Whiffen and Keegan to sell the paintings. Further, Mrs. Wallis apparently directed Whiffen and Keegan to have copies of the paintings made in London to be used as replacements to conceal her dealings from Mr. Wallis.

In January 1981, Whiffen and Keegan went to Wildenstein's offices in New York and offered to sell to Wildenstein two of Mrs. Wallis' paintings, "Houses of Parliament" by Monet and "The Siesta—A Brittany Landscape" by Gaugin. Whiffen and Keegan produced a power of attorney and other documents demonstrating their authority to deal in and sell the paintings, and Mrs. Wallis' ownership of them. At the conclusion of this meeting, Wildenstein offered to purchase the two paintings for $650,000. Whiffen and Keegan indicated that this price was unacceptable and departed. However, several days later, on January 8, 1981, Whiffen and Keegan returned to Wildenstein and agreed to sell the two paintings for $650,000. Thereupon, Wildenstein purchased the paintings.

Mrs. Wallis never told Mr. Wallis that she had sold the paintings. On August 20, 1981, after Mr. Wallis learned that Wildenstein had acquired the two paintings, counsel for the Wallises, Jeffrey Glassman, wrote to Wildenstein. In his letter, Mr. Glassman informed Wildenstein that the paintings had been sold without the permission of either Mr. or Mrs. Wallis and demanded their return. Thereafter, Mr. Glassman initiated negotiations with Jeremy Epstein, counsel for Wildenstein, for return of the two paintings. On April 20,

---

**1.** This disposition makes it unnecessary to address defendants' other motions attacking the complaint.

1982, the Wallises and Wildenstein executed a settlement agreement ("the Agreement"). By the Agreement, Wildenstein sold the paintings back to the Wallises in exchange for $665,000, which represented Wildenstein's original purchase price plus its expenses.

In addition, Wildenstein was granted a right of first refusal and an exclusive right of consignment with respect to all fifteen paintings in the Wallis Collection. The provisions granting Wildenstein the purchase option are contained in paragraph 3 of the Agreement:

> If Mr. Wallis, Mrs. Wallis, or, upon their decease, the executors of their respective estates, receives an offer acceptable to him or her for the purchase of any painting ... now in the possession of Mr. or Mrs. Wallis, they shall give notice to Wildenstein of such offer and its terms and conditions at least thirty (30) business days prior to the proposed sale and Wildenstein shall have the option to purchase such painting upon the same terms and conditions as those of such offer by giving Mr. Wallis, Mrs. Wallis, or their respective executors notice of its election to exercise the option within twenty (20) business days after receiving notice of the proposed sale.

The provisions granting Wildenstein an exclusive right of consignment are contained in paragraph 4 of the Agreement, which provides in relevant part:

> If Mr. Wallis, Mrs. Wallis, or, upon their decease, the executors of their respective estates, determines to sell at auction any painting [now in the possession of Mr. or Mrs. Wallis], such painting shall first be consigned exclusively to Wildenstein for sale in accordance with the consignment agreement appended hereto as Exhibit B.

Paragraph 4 also provides the method for determining the price at which a painting is to be consigned and grants Wildenstein the exclusive right of consignment for six months after receipt of a consigned painting.

The Agreement's purpose in conferring upon Wildenstein the purchase option and the exclusive right of consignment is stated in paragraph 5:

> Prior to the time a painting ... is consigned to Wildenstein under the terms of paragraph 4 herein or notice of an offer is given pursuant to paragraph 3 herein, Mr. Wallis, Mrs. Wallis, or, upon their decease, the executors of their respective estates, shall not consign or offer to sell that painting to any other person or institution. It is the intent of this Settlement Agreement that Wildenstein shall have the first opportunity to purchase or sell all paintings [now in the possession of Mr. or Mrs. Wallis]; provided, however, such opportunity of Wildenstein to purchase or sell shall cease upon the distribution from the estate of Mr. or Mrs. Wallis to any charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

The parties who are bound by the Agreement are identified in paragraph 8:

> Any reference herein to Wildenstein, Mr. Wallis, or Mrs. Wallis shall be deemed to refer to any of their respective executors, successors, and assigns, and the terms and provisions of this Settlement Agreement shall constitute obligations and shall inure to the benefit of the executors, successors and assigns of Wildenstein, Mr. Wallis and Mrs. Wallis, specifically excluding therefrom any charitable organization described in Section 501(c)(3) of the Internal Revenue Code, which shall have received any painting [now in the possession of Mr. or Mrs. Wallis] pursuant to the last will of Mr. or Mrs. Wallis or pursuant to a trust created by Mr. or Mrs. Wallis.

Thus, the Agreement provides that the Wallis defendants must give Wildenstein at least thirty days notice prior to any proposed sale of a painting in the Wallis Collection and that Wildenstein shall have the option to purchase such painting upon the same terms and conditions as those of the proposed sale. The Agreement further provides that if the Wallis defendants determine to sell any painting at auction, such painting shall first be consigned exclusively to Wildenstein for six months.

Wildenstein's rights of first refusal and exclusive consignment are not limited to the lifetime of Mr. and Mrs. Wallis, but are also binding upon the Wallises' executors, successors and assigns, and can be asserted by Wildenstein's successors and assigns. Finally, the Agreement extinguishes the parties' rights and obligations with respect to any paintings in the estate of Mr. or Mrs. Wallis that are distributed to any charitable organization organized and described in Section 501(c)(3) of the Internal Revenue Code.

At the time of Mr. Wallis' death in 1986, Mr. Epstein was advised that the paintings in the Wallis Collection were being distributed to the Wallis Foundation, a charitable organization under Section 501(c)(3) of the Internal Revenue Code. Mr. Epstein confirmed his understanding of the distribution to the Foundation in a letter to Mr. Glassman dated October 21, 1986, while at the same time reminding Mr. Glassman of the obligations imposed by the Agreement.

Wildenstein asserted no claim in the probate proceeding at the time of Mr. Wallis' death, and took no action until 1989 when it learned that the Wallis Collection was to be sold at auction. On May 9, 1989, Wildenstein filed its complaint and brought an order to show cause seeking to enjoin that auction which was scheduled to take place on May 10, 1990. I denied a temporary restraining order because there was no showing of irreparable harm. Since Wildenstein is an art dealer, any harm to it is compensable in money.

Wildenstein's complaint contains six counts, all of which allege violations of Wildenstein's rights under the Agreement. The first count against the Wallis Estate and Brent Wallis as executor alleges that Hal Wallis fraudulently induced Wildenstein to enter into the Agreement. The second count alleges that all defendants conspired to defraud Wildenstein by fraudulently inducing it to enter into the Agreement and by willfully violating the Agreement. The third and fourth counts allege breach of contract and fraud and are asserted against Brent Wallis individually for willfully violating the terms of the Agree-

ment in connection with the sale of Renoir's "Jeune Fille au Chapeau a Coquelicots," which had been given to him by Hal Wallis, his father. The fifth and sixth counts for breach of contract and fraud allege that the Wallis Foundation, and Brent Wallis in his capacity as its president, revoked the permanent loan of certain paintings to the Los Angeles County Museum of Art in violation of Hal Wallis' instructions, and that they intended to sell those paintings at auction in violation of Wildenstein's rights under the Agreement. In addition to injunctive relief, Wildenstein seeks rescission of the Agreement or, in the alternative, monetary damages on each count, as well as costs and attorneys' fees.

## Discussion

### I. Choice of Law

■ A threshold question is whether New York or California substantive law governs the issues in this case. In a diversity action, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts apply a "paramount interest" test to choice of law issues in contract disputes. *See Hunter v. Greene*, 734 F.2d 896, 899 (2d Cir. 1984). Under that test, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576 (1969). *See also Damin Aviation Corp. v. Sikorsky Aircraft*, 705 F.Supp. 170, 174 (S.D.N.Y.), *aff'd*, 880 F.2d 1318 (1989). This "paramount interest" test governs matters bearing on the validity of the Agreement.

■ Whether the Agreement should be construed under New York or California law is a close question. Negotiations took place in both New York and California. At the time, two of the paintings in the Wallis Collection were in Wildenstein's possession

in New York and the remainder of the Collection was in California. The Agreement was executed in New York by Wildenstein, and by the Wallises in California. Both parties appear to agree that reliance on New York law is appropriate in this case. Plaintiff argues that New York law governs because New York has a greater interest than California. Defendants contend that although California has a greater interest, there is no difference between the New York and California Rule Against Perpetuities. I conclude that New York has sufficient contacts with the transaction to justify the application of New York law.

## II. The Rule Against Perpetuities

Defendants have moved to amend their answer to include the defense of the Rule Against Perpetuities and then ask for summary judgment based on that defense. A motion for summary judgment shall be granted if the court "determines that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

New York's Rule Against Perpetuities provides in pertinent part:

(a)(1) The absolute power of alienation is suspended when there are no persons in being by whom an absolute fee or estate in possession can be conveyed or transferred.

(2) Every present or future estate shall be void in its creation which shall suspend the absolute power of alienation by any limitation or condition for a longer period than lives in being at the creation of the estate and a term of not more than twenty-one years. Lives in being shall include a child conceived before the creation of the estate but not born thereafter. In no case shall the lives measuring the permissible period be so designated or so numerous as to make proof of their end unreasonably difficult.

(b) No estate in property shall be valid unless it must vest, if at all, not later than twenty-one years after one or more lives in being at the creation of the estate and any period of gestation involved. In no case shall lives measuring the permissible period of vesting be so designated or so numerous as to make proof of their end unreasonably difficult.

N.Y. Est. Powers & Trusts Law § 9–1.1 (McKinney 1967).

■ Under this Rule, a provision which creates a contingent future interest which might vest beyond the statutorily permissible period, i.e. "later than twenty-one years after one or more lives in being at the creation of the estate," is void. All parties recognize that the Agreement violates the Rule Against Perpetuities, if the Rule applies. The Agreement restricts not only the right of Mr. and Mrs. Wallis, as individuals, to dispose of the paintings in the Wallis Collection in any manner they choose, but also binds "the executors of their respective estates" and their "successors and assigns." Similarly, the Agreement not only grants rights to Wildenstein, but also to its "successors and assigns" without any limitations on the potential duration of the rights. The critical question is whether the Rule Against Perpetuities applies to the Agreement.

The controlling New York case is *Metropolitan Transportation Authority v. Bruken*, 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379 (1986). In *Bruken*, the New York Court of Appeals addressed the question of whether the Rule Against Perpetuities applies to preemptive rights, i.e. rights of first refusal. In that case, the Metropolitan Commuter Transportation Authority, later known as the Metropolitan Transportation Authority ("MTA"), purchased all the capital stock of the Long Island Railroad from the Pennsylvania Railroad. Among the assets acquired were 65 acres of land in Queens which had been used by the Long Island Railroad as a freight yard. *Id.* at 159, 501 N.Y.S.2d at 307, 492 N.E.2d at 380. As part of the consideration, MTA conveyed to Delbay Corporation, a subsidiary of the Pennsylva-

nia Railroad, air rights above this property and easements to develop those air rights. In an additional agreement, Delbay was granted the right to purchase twelve lots in the Queens freight yard at market value if the MTA later determined that it no longer needed the property for its transportation operations. *Id.* at 160, 501 N.Y.S.2d at 307, 492 N.E.2d at 380. The assignable "option" agreement was to last for 99 years, and the holder of the "option" was given 90 days after notice by MTA to purchase the property. The issue presented to the New York Court of Appeals was whether that agreement violated the Rule Against Perpetuities. *Id.*

In *Bruken* the court held that the rigid statutory Rule against Perpetuities does not govern preemptive rights in commercial and governmental transactions, and that instead, the common law rule against unreasonable restraints on alienation should be applied to such transactions. The court reasoned from earlier cases that:

> Implicit in these decisions is a recognition that although preemptive rights unlimited in duration violate the rule against remote vesting they do so only marginally and that application of the rule, because of its inflexibility, may operate to invalidate legitimate transactions. This is so particularly in commercial and governmental activities because neither "lives in being" nor "twenty one years" are periods which are relevant to business or governmental affairs. In such cases the need to insure free alienability is served more effectively if the validity of the preemptive right is assessed by applying the common law rule prohibiting unreasonable restraints.

*Id.* at 165–166, 501 N.Y.S.2d at 311, 492 N.E.2d at 384 (citations omitted). After applying the common law rule, the court found that the right of first refusal in the freight yard lots was a reasonable restraint on alienation.

Defendants argue that the *Bruken* exception to the Rule Against Perpetuities has no application to preemptive rights in privately owned works of fine art. Wildenstein responds that the Agreement was a commercial transaction which *Bruken* exempts from the Rule Against Perpetuities.

Clearly, the preemptive rights of purchase and sale sought by Wildenstein have none of the beneficial effects described by the Court of Appeals in *Bruken.* On the contrary, under the Agreement, a family is forever restricted in the free disposition of fine art, the development of the property is not facilitated, and public and general commercial interests are not promoted. Whether the *Bruken* case rests on the Court's analysis of the utility of that particular transaction in promoting real estate development or on the Court's more generalized summary that the Rule Against Perpetuities does not apply to preemptive rights in commercial and governmental transactions is difficult to discern.

An equally difficult question is whether the Agreement was a commercial transaction within the meaning of *Bruken.* This was not an arrangement between members of a family, but rather an arms length transaction between avid art collectors and a major art dealer. Nevertheless, from Mr. Wallis' perspective, the Agreement was for the purpose of restoring two beautiful paintings to his and his family's possession. For Wildenstein, it was an opportunity to acquire the right to sell all of the works in the Wallis Collection, a valuable commercial opportunity for a corporation in the business of buying and selling works of art.

In any event, I need not decide whether the transaction between Wildenstein and the Wallises was the type of commercial transaction contemplated by the *Bruken* court as an exception to the Rule Against Perpetuities. As discussed above, after holding that the Rule did not apply in *Bruken,* the court determined the validity of the preemptive right under the common law rule against unreasonable restraints on alienation. Even if the Rule Against Perpetuities does not apply to the facts of this case, I find that the combined exclusive consignment right and right of first refusal provisions of the Agreement are unreasonable restraints on alienation, and are therefore invalid. In view of the New York

Court of Appeals' treatment of the common law rule against unreasonable restraints on alienation as a part of its analysis of the statutory Rule Against Perpetuities, defendant's motion requires consideration of the common law rule as well as the Rule Against Perpetuities. Both parties have addressed this issue in their supplemental briefs.

### III. Rule Against Unreasonable Restraints on Alienation

All rights of first refusal restrain alienation. Whether the restraints imposed by such rights are reasonable must be determined on a case-by-case basis. In *Bruken*, the court balanced the utility of the restriction against its marginal effect on alienability. The fundamental purpose of both the Rule Against Perpetuities and the common law rule against unreasonable restraints on alienation is to promote the free transferability of property. The *Bruken* court recognized this and sought to preserve contractual restrictions which actually promote the transferability of property even though they violate the letter of the statutory rule.

The *Bruken* court found that the preemptive right in that case clearly served a beneficial purpose which outweighed its minimal effect on alienation. The transaction in *Bruken* "promoted the use and development of property, while at the same time, imposing only a minor impediment to free transferability." *Id.* at 166, 501 N.Y. S.2d at 311, 492 N.E.2d at 384. It allowed the State to obtain a lower purchase price and preserve the transportation facility while giving the Pennsylvania Railroad air rights, the necessary easements to develop those air rights, and a preemptive right for future acquisition of the land so that its interests in the air and ground property could eventually be reunited. *Id.* "The transfer permitted the parties to put both properties, the railroad and the freight yard, to their maximum productive use, a benefit which far outweighed any public interest served by ... invalidation of the preemptive rights to the lots solely because of remote vesting of Delbay's interest." *Id.* at 166–167, 501 N.Y.S.2d at 311–12, 492

N.E.2d at 384–85. In addition, the transaction in *Bruken* between a state authority and a national transportation company was highly publicized and did not impose hidden limitations on the title which could inhibit future transactions. *Id.* at 167, 501 N.Y. S.2d at 312, 492 N.E.2d at 385.

There is no comparable public benefit in this case. Wildenstein argues that the beneficial purpose of the Agreement was the settlement of differences between the parties. If accepted, that argument would exempt all private settlements from the rule against unreasonable restraints on alienation. There is no evidence that the Agreement generally facilitated the business of art dealing. Nor is there evidence that it advanced any interest in privately owned paintings which is similar to the public interest in the maximum use and development of real estate.

Moreover, the alienability of the fifteen paintings in the Wallis Collection is significantly restricted by the preemptive rights in the Agreement. Very few potential bidders would be interested in negotiating a purchase if they knew that Wildenstein could simply match the bid and reap the benefit of their efforts. This discouragement of potential purchasers actually diminishes the alienability of the works. In addition, the rights granted to Wildenstein in perpetuity are not simply rights of first refusal to purchase. If Mr. or Mrs. Wallis or their successors or assigns wished to sell the paintings at auction, as the Foundation ultimately did, Wildenstein retained a six month exclusive consignment right, including the right to sell at a price over which Wildenstein could exercise some control. This arrangement effectively eliminates public auction as a means of sale. It is undisputed that auction is an important method of selling major works of art.

In sum, while it is true that Wildenstein did not acquire the power to compel the paintings to be sold or to purchase or sell the paintings at a fixed price, the Agreement gave it perpetual control over who purchases fifteen paintings, and how they are sold. Because these private restrictions on the transferability of the Wallis

paintings did not further any countervailing public interest in the purchase and sale of works of fine art or otherwise facilitate such transactions, they unreasonably restrain alienation and are therefore invalid.

### *Conclusion*

For the foregoing reasons and because all of plaintiff's claims depend upon the validity of the provisions of the Agreement discussed above, defendants' motion for summary judgment is granted and the complaint is dismissed. With respect to defendants' permissive counterclaim, leave is denied to join an additional party, and plaintiff's motion for summary judgment on the counterclaim is denied because there are genuine issues of material fact.

SO ORDERED.