949 F.2d 632
 WILDENSTEIN & CO., INC., Plaintiff-Appellant,
v.
Brent WALLIS, individually, in his capacity as president of
the Hal B. Wallis Foundation, in his capacity as trustee of
the Hal B. Wallis Trust, and in his capacity as executor of
the Estate of Hal B. Wallis; the Hal B. Wallis Foundation;
the Hal B. Wallis Trust; the Estate of Harold (Hal) B.
Wallis, Defendants-Appellees.
 No. 1683, Docket 91-7254.
 United States Court of Appeals,
Second Circuit.
 Nov. 26, 1991.
 
 Before WINTER, ALTIMARI and MAHONEY, Circuit Judges.
 
 ORDER
 
 1
 On consideration of the briefs and records and the oral argument in this appeal, it is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a complete set of the briefs, appendix, and record filed by the parties with this court.APPENDIX
 
 UNITED STATES COURT OF APPEALS
 FOR THE SECOND CIRCUIT
 
 2
 --------------
 
 Docket No. 91-7254
 Filed November 26, 1991
 
 3
 --------------
 
 
 4
 WILDENSTEIN & CO., INC., Plaintiff-Appellant,
 
 
 5
 --v.--
 
 
 6
 BRENT WALLIS, individually, in his capacity as president of
 
 
 7
 the Hal B. Wallis Foundation, in his capacity as trustee of
 
 
 8
 the Hal B. Wallis Trust, and in his capacity as executor of
 
 
 9
 the Estate of Hal B. Wallis; THE HAL B. WALLIS FOUNDATION;
 
 
 10
 THE HAL B. WALLIS TRUST; THE ESTATE OF HAROLD (HAL) B.
 
 
 11
 WALLIS, Defendants-Appellees.
 
 Certificate
 
 12
 to
 
 
 13
 the New York Court of Appeals
 
 
 14
 (pursuant to McKinney's Revised 1991 New York Rules
 
 
 15
 of Court § 500.17(b)--certification of
 
 
 16
 unsettled questions of state law)
 
 
 17
 Wildenstein & Co., Inc. ("Wildenstein") (a New York corporation, with its principal place of business in New York City), deals in the collection and sales of fine art. Brent Wallis is the son of the late Hal B. Wallis. Brent Wallis is the executor of the Hal B. Wallis Estate ("Wallis Estate"), a beneficiary and trustee of the Hal B. Wallis Trust ("Wallis Trust"), and president and chairman of the board of the Hal B. Wallis Foundation ("Wallis Foundation"). The Wallis Foundation is a California corporation, organized for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1954, as amended. It owns certain paintings in the Wallis Collection. The Wallis Trust is a California trust, created by Hal Wallis, pursuant to a Trust Agreement dated March 18, 1982, and later modified. Upon its creation, the Wallis Trust received, among other things, all works of art then owned by Hal Wallis. After Hal Wallis died, the Wallis Trust transferred most of these works to the Wallis Foundation. In addition, pursuant to a Letter of Instructions to the trustees of the Wallis Foundation, Hal Wallis directed that most of the Wallis Collection be given to the Los Angeles County Museum of Art on permanent loan. The Wallis Estate is a California probate estate arising pursuant to the Will of Hal Wallis, dated July 5, 1985.
 
 
 18
 While he was alive, Hal Wallis was an avid collector of Impressionist and post-Impressionist works of art. He gave several of these paintings to his second wife, Martha Hyer Wallis, as gifts.
 
 
 19
 According to the undisputed allegations of the complaint, Martha Wallis frequently borrowed from money lenders using the paintings as security without her husband's knowledge. In August 1980, she became acquainted with three confidence men, Harold Pruett, Gerhard Whiffen, and Rory Keegan. In November 1980, Martha Wallis needed to borrow one million dollars for an unknown purpose. She contacted these three con-men about the possibility of obtaining a loan. They apparently agreed, and as collateral for the loan, Mrs. Wallis delivered to them four paintings--Monet's "Houses of Parliament," Gauguin's "The Siesta--A Brittany Landscape," and two paintings by Remington. Additionally, Mrs. Wallis executed a power of attorney, which purported to authorize Whiffen and Keegan to sell the paintings.
 
 
 20
 In January 1981, Whiffen and Keegan went to Wildenstein's offices in New York, met with Guy Wildenstein, Vice President of Wildenstein, and offered to sell to Wildenstein "Houses of Parliament" and "The Siesta--A Brittany Landscape." Whiffen and Keegan produced several documents, including the power of attorney given to them by Mrs. Wallis, that demonstrated their authority to sell the paintings and Mrs. Wallis' ownership of the paintings. Mr. Wildenstein offered to purchase the two paintings for $650,000. Whiffen and Keegan initially turned down this offer. Several days later, however, they returned to Wildenstein and agreed to sell the paintings for $650,000, and Wildenstein purchased them.
 
 
 21
 Hal Wallis eventually learned that Wildenstein had acquired the two paintings, even though Mrs. Wallis never informed her husband that the paintings had been sold. Hal Wallis' attorney, Jeffrey Glassman, wrote to Mr. Wildenstein, and informed him that the paintings had been sold without the permission of either Mr. or Mrs. Wallis, and demanded the return of the two paintings. Thereafter, Mr. Glassman initiated negotiations with Jeremy Epstein, counsel for Wildenstein, for return of the paintings. On April 20, 1982, the Wallises and Wildenstein executed a Settlement Agreement (the "Agreement"). Pursuant to the Agreement, Wildenstein sold the paintings back to the Wallises for $665,000--this represented Wildenstein's original purchase price plus its expenses. In addition, Wildenstein was granted a right of first refusal and an exclusive right of consignment with respect to all fifteen paintings in the Wallis Collection.
 
 
 22
 The provisions granting Wildenstein the purchase option are contained in paragraph 3 of the Agreement:
 
 
 23
 If Mr. Wallis, Mrs. Wallis, or upon their decease, the executors of their respective estates, receives an offer acceptable to him or her for the purchase of any painting ... now in the possession of Mr. or Mrs. Wallis, they shall give notice to Wildenstein of such offer and its terms and conditions at least thirty (30) business days prior to the proposed sale and Wildenstein shall have the option to purchase such painting upon the same terms and conditions as those of such offer by giving Mr. Wallis, Mrs. Wallis, or their respective executors notice of its election to exercise the option within twenty (20) business days after receiving notice of the proposed sale.
 
 
 24
 The provisions granting Wildenstein an exclusive right of consignment are contained in paragraph 4 of the Agreement, which provides in relevant part:
 
 
 25
 If Mr. Wallis, Mrs. Wallis, or upon their decease, the executors of their respective estates, determines to sell at auction any painting [now in the possession of Mr. or Mrs. Wallis], such painting shall first be consigned exclusively to Wildenstein for sale in accordance with the consignment agreement appended hereto as Exhibit B.
 
 
 26
 Paragraph 4 also provides the way for determining the price at which a painting is to be consigned and gives Wildenstein the exclusive right of consignment for six months after receipt of a consigned painting.
 
 
 27
 The reason for conferring the purchase option and the exclusive right of consignment upon Wildenstein is stated in paragraph 5:
 
 
 28
 Prior to the time a painting ... is consigned to Wildenstein under the terms of paragraph 4 herein or notice of an offer is given pursuant to paragraph 3 herein, Mr. Wallis, Mrs. Wallis, or upon their decease, the executors of their respective estates, shall not consign or offer to sell that painting to any other person or institution. It is the intent of this Settlement Agreement that Wildenstein shall have the first opportunity to purchase or sell all paintings [now in the possession of Mr. or Mrs. Wallis]; provided, however, such opportunity of Wildenstein to purchase or sell shall cease upon the distribution from the estate of Mr. or Mrs. Wallis to any charitable organization described in Section 501(c)(3) of the Internal Revenue Code.
 
 
 29
 Those who are bound by the Agreement are listed in paragraph 8:
 
 
 30
 Any reference herein to Wildenstein, Mr. Wallis, or Mrs. Wallis shall be deemed to refer to any of their respective executors, successors, and assigns, and the terms and provisions of this Settlement Agreement shall constitute obligations and shall inure to the benefit of the executors, successors and assigns of Wildenstein, Mr. Wallis and Mrs. Wallis, specifically excluding therefrom any charitable organization described in Section 501(c)(3) of the Internal Revenue Code, which shall have received any painting [now in the possession of Mr. or Mrs. Wallis] pursuant to the last will of Mr. or Mrs. Wallis or pursuant to a trust created by Mr. or Mrs. Wallis.
 
 
 31
 Thus, the Agreement provides that the Wallis defendants must give Wildenstein at least thirty days notice prior to any proposed sale of a painting in the Wallis Collection and that Wildenstein shall have the option to purchase such painting upon the same terms and conditions as those of the proposed sale. The Agreement further states that if the Wallis defendants decide to sell any painting at auction, such painting shall first be consigned exclusively to Wildenstein for six months. Wildenstein's rights of first refusal and exclusive consignment are not limited to the lifetime of Mr. and Mrs. Wallis, but are also binding upon the Wallis' executors, successors, and assigns, and can be asserted by Wildenstein's successors and assigns. Finally, the Agreement extinguishes the parties' rights and obligations with respect to any paintings in the estate of Mr. or Mrs. Wallis that are given to any charitable organization organized and described in Section 501(c)(3) of the Internal Revenue Code.
 
 
 32
 When Mr. Wallis died in 1986, Mr. Epstein was advised that the paintings in the Wallis Collection were being distributed to the Wallis Foundation, pursuant to the terms of the Wallis Trust. Mr. Epstein confirmed his understanding of the distribution to the Foundation in a letter to Mr. Glassman dated October 21, 1986, while at the same time reminding Mr. Glassman of the obligations of the Agreement.
 
 
 33
 Wildenstein asserted no claim in the probate proceeding conducted after Mr. Wallis' death. It took no action until 1989, when Wildenstein learned that the Wallis Collection was to be sold at auction. On May 9, 1989, Wildenstein filed a complaint and sought to enjoin the auction, which was scheduled for May 10, 1990. The district court refused to grant a temporary restraining order, on the ground that Wildenstein had failed to show irreparable harm.
 
 
 34
 Wildenstein's complaint contains six counts. The first count alleges that Hal Wallis fraudulently induced Wildenstein to enter into the Agreement. It is brought against the Wallis Estate and Brent Wallis, as executor of the Estate. The second count alleges that all of the defendants conspired to defraud Wildenstein by fraudulently inducing it to enter the Agreement, and by willfully violating the Agreement. The third and fourth counts allege breach of contract and fraud, and are brought against Brent Wallis individually for willfully violating the terms of the Agreement. The fifth and sixth counts allege that the Wallis Foundation, and Brent Wallis in his capacity as its president, revoked the permanent loan of certain paintings to the Los Angeles County Museum of Art, in violation of Hal Wallis' instructions, and that they intended to sell those paintings at auction in violation of Wildenstein's rights under the Agreement. Wildenstein sought, in addition to injunctive relief, rescission of the Agreement or, in the alternative, monetary damages on each count, as well as costs and attorneys' fees.
 
 
 35
 On May 31, 1989, the Wallis defendants answered the complaint, alleging seven affirmative defenses and two counterclaims against Wildenstein. Each of these related to the enforceability of Wildenstein's rights under the Agreement. On June 16, 1989, the Wallis defendants amended their answer and counterclaims, alleging an additional affirmative defense and an additional counterclaim.
 
 
 36
 On February 2, 1990, the Wallis defendants moved for leave to amend their answer and counterclaims to, inter alia, allege an affirmative defense based upon the Rule Against Perpetuities and the common law rule against unreasonable restraints on alienation. The Wallis defendants simultaneously sought summary judgment on this defense.
 
 
 37
 The district court granted this motion for summary judgment in an opinion and order entered February 13, 1991. Wildenstein & Co. v. Wallis, 756 F.Supp. 158 (S.D.N.Y.1991). After determining that New York law applied to this case, the district court analyzed Wildenstein's rights under Metropolitan Transport. Auth. v. Bruken Realty Corp., 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379 (1986). Wildenstein, 756 F.Supp. at 162. The district court, however, refused to decide whether the Wildenstein-Wallis Agreement was the sort of commercial transaction exempted from the Rule Against Perpetuities by Bruken. Id. at 163. Instead, the district court found that Wildenstein's rights under the Agreement violated New York's common law rule against unreasonable restraints on alienation, and thus these rights were unenforceable. Id. at 164-65.
 
 
 38
 Wildenstein appealed to this court, arguing, inter alia, that under New York law, its rights are not an unreasonable restraint on alienation. Additionally, Wildenstein argues that the district court erred in not addressing whether it was entitled to some relief, regardless of the validity of its rights under the Agreement, in order to avoid the unjust enrichment of the Wallis defendants. Nor, Wildenstein contends, did the district court address whether its claims sounding in fraud and fraudulent inducement are viable, again, regardless of the validity of the Agreement.
 
 
 39
 The Wallis defendants argue in response that the district court correctly found that Wildenstein's rights were an unreasonable restraint on alienation. Moreover, they contend that, regardless of whether Wildenstein's rights unreasonably restrain the alienation of the Wallis Collection, those rights violate the New York Rule Against Perpetuities. In support, they cite Morrison v. Piper, 77 N.Y.2d 165, 565 N.Y.S.2d 444, 566 N.E.2d 643 (1990).
 
 
 40
 Although the New York Court of Appeals has recently decided two cases concerning the validity of preemptive rights under the Rule Against Perpetuities--Morrison v. Piper, 77 N.Y.2d 165, 565 N.Y.S.2d 444, 566 N.E.2d 643 (1990); and Metropolitan Transport. Auth. v. Bruken Realty Corp., 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379 (1986)--neither decision resolves the specific issues raised by this appeal. Moreover, there is no New York precedent concerning whether, if the Agreement is invalid, Wildenstein is nevertheless entitled to relief, e.g., for unjust enrichment, or whether its allegations concerning fraud and fraudulent inducement state a claim for relief.
 
 
 41
 The unsettled questions that should be decided by the New York Court of Appeals are as follows:
 
 
 42
 (1) Does the New York Rule Against Perpetuities apply to preemptive rights and future consignment interests in personal property?
 
 
 43
 (2) Does the New York common law rule against unreasonable restraints on alienation invalidate preemptive rights and future consignment interests in personal property?
 
 
 44
 (3) If either the Rule Against Perpetuities or the common law rule against unreasonable restraints on alienation invalidates the preemptive rights and future consignment interests at issue here, can the beneficiary of those rights and interests assert a claim for unjust enrichment stemming from the loss of such rights and interests?
 
 
 45
 (4) If either the Rule Against Perpetuities or the common law rule against unreasonable restraints on alienation invalidates the preemptive rights and future consignment interests at issue here, can the beneficiary of those rights and interests nevertheless state a claim for fraudulent inducement and fraud arising from the transaction that gave it such rights and interests?
 
 
 46
 These questions should be decided by the New York Court of Appeals because they involve important and undecided questions concerning preemptive rights in personal property. There are no New York Court of Appeals cases directly answering these questions, and New York has a strong interest in deciding these questions rather than having potentially erroneous federal appeals court precedent on point.
 
 
 47
 The questions herein presented are likely to recur, and their resolution at this time by the New York Court of Appeals would aid in the administration of justice.
 
 
 48
 The foregoing questions are hereby certified to the Court of Appeals for the State of New York as ordered by the United States Court of Appeals for the Second Circuit.
 
 
 49
 Dated at New York, New York, this 26th day of November, one thousand nine hundred and ninety one.
 
 
 50
 /s/ ELAINE B. GOLDSMITH
 
 Clerk of the United States Court
 Of Appeals for the Second Circuit