**The GREENBERG GALLERY, INC., Donald Morris Gallery, Inc., Barbara Mathes Gallery, Inc., and John C. Stoller & Co., Plaintiffs,**

v.

**Patricia BAUMAN and L & R Entwistle and Co. Ltd., Defendants.**

**Civ. A. No. 91–0439–LFO.**

United States District Court, District of Columbia.

April 2, 1993.

McDermott, Will & Emery by Robert A. Weiner, Julie A. Day Marion, New York City, Charles R. Work, Washington, DC, for plaintiffs Greenberg Gallery, Inc., Donald Morris Gallery, Inc., Barbara Mathes Gallery, Inc. and John C. Stoller, & Co.

David J. Eiseman, Golenbock, Eiseman, Assor, Bell & Perlmutter, New York City, David E. Sellinger, Tucker, Flyer & Lewis, Washington, DC, for defendant Patricia Bauman.

Gilbert S. Edelson, Rosenman & Colin, New York City, Jerold L. Jacobs, Rosenman & Colin, Washington, DC, for defendant L & R Entwistle and Co. Ltd.

*MEMORANDUM*

OBERDORFER, District Judge.

In this diversity contract dispute, plaintiffs are art dealers who claim that a mobile for which they paid $500,000 is not the Alexander Calder work entitled Rio Nero they thought they were acquiring. They sue the dealer who sold them the mobile, L & R Entwistle and Co. Ltd. ("Entwistle Gallery"), and Patricia Bauman, the private collector living in Washington, D.C. who sold the mobile through Entwistle Gallery. Plaintiffs invoke theories of fraud, breach of express warranty, and mutual mistake of fact.

The parties waived a jury trial and tried the case to the bench. At the conclusion of plaintiffs' case, I found they had failed to prove their fraud claim by clear and convincing evidence and dismissed it. Having received defendants' testimony and exhibits,

and heard arguments by counsel for each party, I now find plaintiffs have failed to prove or persuade by a preponderance of the evidence that the mobile is not the Calder Rio Nero. I therefore conclude plaintiffs are not entitled to judgment on either of their remaining theories.

## I. FACTS

The testimony and exhibits establish by a preponderance of the evidence that in 1959, Alexander Calder created and signed with the initials "AC" a 31″ by 65″ black hanging mobile entitled "Rio Nero." The mobile was constructed of sheet metal and steel wire and composed of 27 hanging blades or elements. In 1962, Klaus Perls and Perls Galleries of New York City sold the Rio Nero to one Anspach. Before selling the piece, Perls, as was his custom, took an archival photograph of the mobile for the Galleries, after first lightly tethering its parts to prevent movement. In 1967, Perls reacquired the mobile from Anspach and sold it to Patricia Bauman's father, Lionel Bauman. Except for its exhibition in 1984 by the Herbert Palmer Gallery of Los Angeles, the mobile hung in Lionel Bauman's Palm Springs, California home until his death in 1987; Patricia Bauman remembered seeing it hanging there. Lionel's will bequeathed the mobile to Patricia. After Lionel's death, Herbert Palmer, the owner of Palmer Gallery, appraised it for the estate as an untitled Calder. Lionel's executor delivered it to Bauman's home in Washington in July 1989, where it hung until November 1989.

In November 1989, Palmer Gallery sought and obtained possession of the mobile on consignment until January 31, 1990. Palmer Gallery exhibited it for sale at the Los Angeles Art Fair beginning in December 1989. In January 1990, Ronald Greenberg, owner of plaintiff Greenberg Gallery, Inc., saw the mobile at the Los Angeles Art Fair and was interested in it, but did not pursue the purchase because Palmer's asking price of $750,-000 was too high.

At the time Palmer was showing the mobile, he was not aware of any name for it and exhibited it as an untitled Calder. In response to Palmer's request for more information, Bauman contacted Perls Galleries seeking documentation of the 1967 sale to her father. In addition, Bauman asked Palmer to photograph the piece and send the resulting transparency to Perls Galleries for identification. With the transparency before it, Perls Galleries confirmed the 1967 sale to Lionel Bauman and furnished Patricia a copy of the invoice evidencing that sale. The Perls invoice identified the piece as a black sheet metal and steel wire hanging mobile, 31″ by 65″, entitled "Rio Nero," and signed "AC."[1]

Bauman passed the Perls invoice information on to Palmer, who added the name "Rio Nero" to the display at the Los Angeles Fair. Palmer sought to extend his consignment beyond January 31, 1990, but Bauman refused the request.

In January 1990, while the mobile was on exhibit in Los Angeles, Roberta Entwistle, a co-owner of Entwistle Gallery with her former husband, Lance Entwistle, visited Patricia Bauman and her husband, John Bryant, at their Washington home. Roberta made the visit at the suggestion of the National Gallery of Art to advise the Baumans about their private collection. In the course of the visit, in response to an inquiry about what Bauman might wish to sell from the collection, Bauman told Roberta about the Calder mobile she had inherited.

Roberta and Lance Entwistle then began seeking purchasers for the mobile. Their first prospect was Donald Morris, owner of plaintiff Donald Morris Gallery, Inc., of Birmingham, Michigan. Without identifying Bauman, the Entwistles informed Morris that the piece was the Rio Nero by Calder and was owned by a respectable private collector who had inherited it from her father, who, in turn, had purchased it from Perls Galleries. Morris made two offers that were

---

**1.** Bauman testified that after Perls had seen the transparency and learned the piece was on the market, he personally asked Bauman to offer it for sale through Perls Galleries. Bauman said she would consider the offer if the consignment through Palmer was unsuccessful. Perls did not recall the conversation and testified only that his practice would not be to make such an inquiry.

too low and which Bauman instructed the Entwistles to reject.

In March 1990, the Entwistles approached a second prospect, Greenberg, who had seen the piece when exhibited by Palmer in Los Angeles. In the ensuing negotiation, the Entwistles told Greenberg about the Perls invoice and furnished him the transparency made by Palmer. After arranging for equal participation in the purchase by the other three plaintiffs, Greenberg offered $500,000 for the mobile, with the understanding that Entwistle Gallery would deliver it to him promptly and that he could inspect it before making payment. Greenberg received delivery on March 23, 1990, had the mobile assembled and hung, compared it with the transparency, and satisfied himself that it was the piece in the transparency and that he had seen in Los Angeles. Whatever Greenberg may have observed at that time, he advised his co-venturers that the piece was "fabulous" and "beautiful." They assembled the funds and paid $500,000 to the Entwistle Gallery. The Entwistles, in turn, delivered $485,000 to Bauman's decorator, a Swiss Corporation, retaining $15,000 for their trouble and risk.[2] Two weeks later, the Entwistle Gallery furnished to Greenberg the 1967 Perls invoice, from which Lionel Bauman's name was redacted at Patricia's request.

Between March and November 1990, plaintiffs exhibited the mobile around the country and offered it for sale as a Calder for $750,000. Greenberg published a photograph of the mobile in his catalogue, describing it as Calder's Rio Nero. In May 1990, Greenberg shipped it to Chicago for display and sale at the Chicago Art Fair, together with 14 other Calders from his gallery. At the Fair, the other co-owners (Morris; Barbara Mathes, owner of plaintiff Mathes Gallery, Inc. of New York City; and John Stoller, owner of plaintiff John C. Stoller & Co. gallery of Minneapolis, Minnesota) all saw the mobile for the first time. All noticed problems with its movement and balance and that some of the pieces bumped each other. Greenberg

and Stoller attempted to rearrange the mobile so it would hang more aesthetically. They took off armatures, disconnected the mobile's blades, and moved them around. Despite the problems, Greenberg, Mathes, Stoller, and Morris concluded the mobile matched the transparency and the description in the Perls invoice.

In late May 1990, following the Chicago Art Fair, the mobile was shipped to the Mathes Gallery in New York and offered for sale there. On two separate occasions, Morris' son spent one hour and an hour and a half, respectively, trying to reconfigure the mobile to conform to the transparency. Despite these efforts, neither he nor Mathes believed the mobile was moving correctly. Morris' son phoned Morris and told him he had "funny feelings" about the mobile and could not get it to work right. At this time, Morris began to doubt it was authentic.

The mobile remained for sale at the Mathes Gallery until October 1990. In October, it was shipped to the Morris Gallery in Detroit. Morris and his son again attempted to reassemble it by manipulating its blades and armatures. Despite his doubts, Morris continued to believe the mobile was the same as that depicted in the transparency and that it simply had been hung incorrectly. He did not seek expert assistance in hanging it. Thereafter, however, he stopped showing it to potential buyers. After Morris left on a trip to Europe, his son continued in his efforts to rearrange the mobile.

On November 17, 1990, Morris met with Lance Entwistle and expressed his concern that the mobile might not be authentic. On November 19, 1990, Lance sent a copy of the Perls invoice to Morris. The Perls Galleries confirmed to Morris that the invoice was a correct copy of the bill of sale from Perls Galleries and sent Morris a copy of the archival photograph. Upon comparing the mobile to the archival photograph, Morris concluded the mobile was not the same. Plaintiffs then decided to send the mobile from Detroit to New York for inspection by Perls Galleries, and Mathes called Perls for an appointment.

---

**2.** It is unnecessary to solve the legal riddle about whether the $15,000 was a profit or a commission.

On December 3, 1990, Perls compared the mobile to Perls Galleries' archival photograph. Based upon this inspection, which lasted a maximum of 10 minutes, Perls concluded the mobile was not the authentic Calder but was "a copy of the original mobile by Alexander Calder registered with Perls Galleries under No 7902/P4754, entitled RIO NERO, signed and dated 1959." Pl.Ex. 59.

After plaintiffs requested, and Bauman refused to accept, rescission of the contract, this lawsuit ensued.

At trial, the parties presented competing expert testimony regarding the mobile's authenticity. Plaintiffs introduced the videotaped deposition of Klaus Perls as their Calder expert. Perls, age 79, has been a partner in Perls Galleries since 1937. The Galleries served as Calder's exclusive American dealer between 1955 and 1976, and together with Pace Gallery and the Maeght Galleries of Paris (Calder's former European dealer), Perls Galleries are among the world's leading experts on Calder. The Galleries have sold "hundreds" of Calder paintings and sculptures, and Perls himself has seen "several thousand" Calders. Deposition of Klaus Perls ("Perls Dep.") at 6. He is asked to appraise the value or authenticity of Calder works several times a year. Perls says that his assessment of Calders is based on knowledge and feelings acquired from 20 years as Calder's dealer.

Perls examined the mobile in December 1990 for a maximum of 10 minutes and looked at it again for a "couple of minutes" before an October 1991 deposition. On both occasions, his examination was limited to comparing a few of the mobile's blades to the archival photograph. At no time did Perls speak to the "AC" signature or offer any opinion as to whether it was forged.[3]

Based on these two examinations, Perls determined that the mobile was not an authentic Calder. Instead, "[i]t is an attempt to copy it exactly." *Id.* at 18. Although stating that the mobile is as "exact a copy as can be produced," *id.* at 12, he concluded that "every single blade . . . is not as it appears in the original."[4] *Id.* at 19–20.

Perls had not seen the Rio Nero mobile for 23 years and did not rely on his recollection in making his determination. Instead, he relied solely on his methodology of tethering a mobile for an archival photograph and then comparing the photograph to an actual mobile. Perls himself developed the method and is of the opinion that it is the most reliable means of determining a Calder's authenticity. He conceded, however, that "[i]t is extremely difficult to photograph Calder mobiles," *id.* at 12, and that comparing a three-dimensional work against a two dimensional photograph is inherently problematic. *Id.* at 28. A photograph, for example, can capture only one of a mobile's myriad possible configurations. Perls acknowledged that the size of the blades cannot be determined accurately in a photograph, nor can the shape of the rods, and the camera angle also affects the photographed appearance of both the blades and the mobile. Even in an archival photograph, according to Perls, the blade shapes may be distorted, "up to a point." *Id.* at 34. He conceded that even the archival photographs are imperfect representations of the actual works and that even with an archival photograph, authenticating a work would be "very difficult for someone who is not as familiar as I am with Calder mobiles." *Id.* at 32. Perls nevertheless stated that his process of tethering the mobiles makes the archival photographs much more accurate depictions than other photographs, and that the exact shape of every blade "is quite clear." *Id.* at 37.

Perls stated that a Calder "forgery . . . is usually quite apparently a forgery because it does not fit into the feel of a real Calder." *Id.* at 25. In this particular case, however,

**3.** Although the court overruled defendants' objection at trial to witness Mathes' testimony regarding a statement of Perls that the signature on the mobile he examined was a forgery, on reflection, the objection should have been sustained and the testimony stricken from the record. This being a bench trial, consideration of this hearsay must be precluded. The accompanying Order will so provide.

**4.** Perls stated that the piece "is the mobile that is reproduced on the [Palmer transparency]," but was not that depicted in the archival photograph. *Id.* at 18.

even he "might never be able to determine" the authenticity of the mobile without the archival photograph, because it is "an exact copy." *Id.* at 55. This particular mobile showed that

> it is possible to copy a Calder so exactly that only photographic evidence could 100 percent prove that it is or is not a work of Calder ... It is only when an exact copy like this is made that it becomes difficult to tell the difference of style, because whoever made this copy, copied the style of Calder as exactly as it can be done.

*Id.* at 25–26. Perls noted that "the relative length of the rods [was] not the same" as in the archival photograph, but acknowledged that with age, the rods of a Calder mobile may alter their shape. *Id.* at 19–20. Thus, "the determination should not rely on the view in the photograph of the rods." *Id.* at 31.

Perls testified that the mobile contained certain characteristics of a Calder work. Nothing about the feel of the blades or paint, the attachment of the blades to the armatures, the type and form of the linkages, or the spacing of the components indicated to him that it was not an authentic Calder. "Whoever made it, made as exact a copy as he knew how." *Id.* at 59.

When the archival photograph was compared to the mobile, however, he testified,

> [I]t becomes quite apparent that ... this blade here which has specific points and angles on the original is not the same as this blade [on the mobile]. This goes for every blade to go down the line, and each blade is reproduced as well as anybody thought he could do it. But they are not identical ·in shape to the shapes as shown on the Perls Gallery [archival] photograph.

*Id.* at 19.

Moreover, despite the fact that he found aspects of the mobile characteristic of Calder, he stated, significantly,

> There are certain elements here that don't work. You see ... *this particular mobile has been hurt.* For instance, this particular piece here is not the way it would look in a Calder. This loop that I am touching would be vertical ... Now, that is some-

thing that can happen in an accident. I don't know what has happened to it because *this particular piece has had an accident.*

*Id.* at 59–60 (emphasis added).

Perls stated that Calder restorations have occurred. The rods of Calders that have been mishandled may bend, for example, and "no longer correspond to the original photograph." *Id.* at 19. He qualified this testimony, however, by stating that the need to repair a Calder, while it occurs, is "very rare." *Id.* According to Perls, Calder mobiles are built "to last a lifetime." *Id.* at 45. The piano wires and blades are difficult to chip or bend and dropping a mobile will not hurt it. He believed that replacing some parts of a Calder mobile, even by a skilled artisan, would be problematic. "[T]he balance of these [mobiles] is miraculous ... [F]or someone to take one of these rods and try· and do ·it so that it works exactly the same way is extremely difficult." *Id.* at 47. The design of the mobiles is so precise that even repainting a white mobile can throw off the balance, because the lead content of white paint is so high. Perls did, however, testify that replacing one rod or one blade in an authentic Calder "could probably be done in such a way that it would look all right." *Id.* at 53.

Ultimately, Perls appears to have inferred his conclusion that the mobile before him was an "exact copy," and therefore a forgery, from his belief that a separate, identical mobile named the Rio Nero existed somewhere.

> Calder never repeated himself. There are no two Calder mobiles that are exactly alike. *The fact that this is a copy, an exact copy of the original I received from Calder is proof that it couldn't be by Calder.* Even if the blades were exactly the same, it couldn't be because Calder never made two of the same.

*Id.* at 62; *see also id.* at 64–65. When asked if he knew where the other, authentic Rio Nero was, Perls stated, "We sold it to Mr. Bauman." *Id.* at 66.

Although he repeatedly testified that "every blade" in the mobile was not the same as in the archival photograph and therefore was

not by Calder, on cross-examination, Perls conceded that he had not, in fact, compared all 27 blades of the mobile to the archival photograph. "[Y]ou just look at two or three blades and they are wrong. And then from there on you don't go any further." *Id.* at 61; *see also id.* at 62, 68. At plaintiff counsel's request, therefore, Perls took "two minutes" during the deposition to compare each blade. *Id.* at 72. He stated that he examined all the blades during that period, having explained that with an archival photograph in hand, it would only "take a minute" to determine the authenticity of such a mobile. *Id.* at 55. "That kind of thing is routine here in this gallery and I do it all the time." *Id.* at 83. Based on this supplemental examination, he reaffirmed that "every single blade is not by Calder." *Id.* at 101.

The confidence with which Perls testified regarding authenticity contrasted sharply with his relatively poor memory regarding many other recent events. He could not recall, for example, much of his conversation with Mathes when she discussed the mobile with him in November 1990. He could not determine whether the handwriting on the letter that had been returned to Palmer from Perls Galleries was that of his long-time gallery partner. He did not recall any conversation with Bauman regarding acquiring the Rio Nero in January 1990, though he stated such a conversation was likely. He did not remember, but denied, that he would have called Bauman to inquire why she had not asked Perls Galleries to sell the mobile. He did not remember seeing the January 1990 letter from Palmer inquiring about the Perls invoice, though he stated that according to the Galleries' procedure, he would have seen it. Finally, he did not recall ever having sent a copy of the Perls invoice to the Entwistles.

Bauman traversed Perls' video-taped deposition with that of Linda Silverman, the owner of Linda R. Silverman Fine Art, Inc. Silverman has been a fine art dealer in impressionist and early 20th Century art for nine and a half years. Prior to that time, she worked from 1972 to 1983 as a cataloguer for,

and later as the director of, the contemporary art department of Sotheby's auction house in New York. She appraised Calders in both those capacities beginning in 1978. She considers herself an expert in Calder and his signature, as well as in all the other contemporary (post-World War II) artists handled by Sotheby's. Sotheby's sells about 10 Calder works each year, and she has examined "hundreds and hundreds" of Calder works at Sotheby's auctions, and in art galleries, books, and private homes. Deposition of Linda Silverman ("Silverman Dep.") at 32. Silverman has appraised or authenticated approximately 50 Calder works, of which five and ten of those were formal appraisals.

Silverman examined the mobile for approximately an hour and a half at the Mathes Gallery in October 1991. She had it lowered from the ceiling so she could examine the elements properly: "check for the signature ... the quality of the paint ... the connecting rods ... [and] the forms of the rods and the blades." *Id.* at 13. She examined "every blade and every joint and every wire," and "did it very meticulously." *Id.* at 39.

Based on this examination and her knowledge of the artist, Silverman testified that the mobile was "an authentic work by Calder," and that the paint, rods, and blades "absolutely did conform to Calder's work." *Id.* at 12. The blades and connections "were typical of Calder's shapes" and patterns, and "how he would place them in order to create the mobile." *Id.* at 13–14. The weldings and constellations of the blades also were "very typical of Calder's works." *Id.* at 14. Most important, she testified (without contradiction by Perls) that the signature was "absolutely accurate."[5] *Id.* at 13.

Silverman refused to rely on the archival photograph, testifying that photographs "are not reliable" measures of authenticity, since the lighting, camera angle, distance, and movement affect the shape of the work. *Id.* at 15; *see also id.* at 52.

---

**5.** It can be judicially noted that handwriting, like fingerprints, are subject to established objective tests, expert opinions about which are admissible. There is evidence that Calder created over

1,000 mobiles, in addition to his paintings, so that authentic samples of his signature must be plentiful.

The "provenance" of the mobile, or the chain of ownership from the original artist to the present owner, is accepted in the art world as persuasive evidence of a work's authenticity and was important to Silverman's conclusion here. *Id.* at 25. She testified that she "took the time to really check what had happened to the piece and what in fact the piece is all about," and that she felt "very strongly" about her opinion. *Id.* at 15–16. Because she had no independent knowledge of the Rio Nero, though, she could not testify that the mobile was the Rio Nero.

Like Perls, Silverman commented that her "first feeling" upon examining the mobile was that "there was an assembly problem." Although the mobile "was definitely an authentic work," it struck her from the beginning "that some of the pieces had been altered or bent or forced," *id.* at 16, or otherwise "tampered with." *Id.* at 18. She agreed with Perls that some of its parts might not be originals of Calder and felt that one joint, in particular, might have been replaced. Because of the apparent alterations and the observable damage, Silverman testified that she would not have sold the mobile as a Calder in its present, damaged condition. She believed, however, based on information obtained from Sotheby's (and contradicted by Greenberg), that Calders could be restored. After the mobile was "restored to its original intent," *id.* at 16–17, she would have sold it as a Calder, but for a discount of 25 to 30 percent.

Silverman was not impressed by Perls' opinion. She believed that Perls had inspected the mobile "very haphazardly," *id.* at 15, and "in a very hurried manner." *Id.* at 28. She questioned his method in relying exclusively on comparing the mobile blades to those in the archival photograph. As a result, she felt, Perls "really did not pay attention to the work itself." *Id.* at 28.

Andre Emmerich is a dealer in contemporary (post-World War II) art who has owned his own gallery since 1954 and has sold Calders. He was called by plaintiffs to address to the reasonableness of the time in which plaintiffs discovered and notified defendants of the alleged forgery. Emmerich testified that difficulty hanging Calder mobiles is rela-

tively common, since they are complex, precisely balanced, and must be disassembled and reassembled for transport. This is particularly true for mobiles with many elements, such as the mobile at issue here. Emmerich thus testified that pieces occasionally bump into each other and that "[y]ou need expert help to get it to hang right." Deposition of Andre Emmerich ("Emmerich Dep.") at 59.

Laurence Casper, a self-employed art dealer for Casper Fine Arts and Appraisals, Inc. of New York, acted as Bauman's expert on the reasonableness of time. He stated that as a dealer who has sold Calders mobiles, but is not expert in them, "I would be very leery about hanging a Calder that was disassembled, without some kind of advice as to someone who has really hung Calders." Deposition of Laurence Casper ("Casper Dep.") at 69. Casper agreed with Silverman and Perls that authenticating a complex, three-dimensional, moving sculpture is a difficult and somewhat subjective process. The constant movement of the rods and blades makes any photograph of a Calder mobile an incomplete depiction of the actual piece. Casper testified that while a photograph may be used as a "possible guide" for assembling a mobile, a two dimensional photograph "would make it extremely difficult to be able to tell" the accuracy of a three dimensional sculpture. *Id.* at 68.

Emmerich corroborated Silverman's testimony that a provenance is "a very good guide to the work being authentic or not authentic," Silverman Dep. at 25, and that the mobile's provenance weighs heavily in favor of authenticity. Emmerich stated that the mobile's flawless provenance, based on the Perls invoice, "is the best proof of authenticity I can think of." Emmerich Dep. at 71, *see also id.* at 31. To him, "[t]he overwhelming assumption, based on the paper trail ... [would be] that the piece is authentic." *Id.* at 25. Moreover, Emmerich stated that while forged provenances attached to fake works of art are not uncommon in the art world, in his experience and career in the field, he had "never heard of that kind of a substitution," *id.* at 32, that is, "of genuine documents being attached to a non-genuine

object." *Id.* at 36. "To be frank," he said, "I have never heard of a Calder fake." *Id.* at 25; *see also* Silverman Dep. at 27. Calder mobiles would be particularly difficult to fake, he stated, because of the genius involved in their construction. "It is a very tough task for a forger to be [that] brilliant an engineer." Emmerich Dep. at 38. Thus, Emmerich's "assumption would be that there are no fakes." [6] *Id.* at 51.

## II. CONCLUSIONS

I conclude the record and circumstantial evidence surrounding the mobile creates a strong presumption that it is an authentic Calder and the Rio Nero. This conclusion follows despite the great weight that must be accorded the opinion of Perls and his premier credentials in respect to Calder's work. As Silverman herself stated, the best way to determine the authenticity of an artist's work is to have it examined by someone who knows the artist's work well or by the artist's gallery dealer. Sotheby's considers Perls Galleries, Pace Gallery, and Maeght Gallery in France the world's leading Calder experts,[7] and Silverman herself previously had sought the opinions of Perls and Arnold Glimsher on Calders. She was of the view that Perls' assessment of the mobile's authenticity would destroy its value in the art market and that Sotheby's would not sell a piece such as the mobile which Perls did not approve.[8]

This is not the market, however, but a court of law, in which the trier of fact must make a decision based upon a preponderance of the evidence.[9] In the present case, balancing the evidence is complicated by the fact that the testimony of both principal experts was somewhat problematic. Silverman refused to examine the archival photograph because she considered it unreliable. She based her determination that the piece was an authentic Calder upon a detailed and extensive examination of the piece, with emphasis on the "AC" signature, and her professional knowledge of Calder's works.

Although Perls' credentials for an opinion on these criteria are vastly superior to Silverman's, he conspicuously did not address the signature [10] or otherwise base his opinion on other criteria in his area of expertise. Instead, he relied on a cursory and mechanical comparison of the mobile to the archival photograph. Given the distortions all experts conceded are involved in photographing Calder mobiles, as well as the inherent difficulties involved in comparing a two-dimensional photograph to a three-dimensional moving piece, this testimony does not carry

6. Perls likewise testified it is extremely difficult to copy or imitate the balance or appearance of a Calder mobile. Each element is critical to the mobile's configuration. Perls Dep. at 49–50. Perls was not asked how often he had seen forged Calder mobiles or whether he had seen other "exact copies" of Calders such as this one.

7. Silverman Dep. at 26. Casper stated that if he had questions regarding hanging a Calder mobile or the mobile's authenticity, "I would go to Perls." Casper Dep. at 71; *see also id.* at 34. In his opinion, Perls Galleries numbers among the four international Calder experts (together with the Calder Foundation and the Pace and Maeght Galleries). *Id.* at 94. Emmerich stated, "[T]here are only two experts on Calder. Klaus Perls and the Galleries Maeght, in Paris." Emmerich Dep. at 14.

8. Emmerich confirmed that "[i]f Klaus Perls says a work is a forgery, it is a forgery in terms of the market. The work is then ipso facto unsalable and should not be touched by any honorable person." Emmerich Dep. at 35.

9. Standard civil jury instruction No. 2–8 (Burden of Proof) states that the term "preponderance of the evidence"

does not mean such degree of proof as produces absolute or mathematical certainty ... [It] means such evidence as, when weighed against that opposed to it, has the more convincing force. It is a question of quality and not of quantity, which is to say that it is not necessarily determined by the number of witnesses or documents bearing on a certain version of the facts. To establish by a preponderance of the evidence is to prove that something is more likely than not so. In other words, a preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, has the more convincing force and produces in your mind's belief that what is sought to be proved is more likely true than not true ...

10. Plaintiffs' failure to attack, through Perls or some other expert, the validity of the "AC" signature is as important to a trier of fact as would be a prosecution's failure to offer fingerprint evidence about an article handled by a party or to explain by testimony its omission.

plaintiffs' burden. The apparent inconsistency in Perls' testimony that the mobile was an "exact copy," *e.g.*, Perls Dep. at 25, 55, 59, and yet "every single blade" was not by Calder, *id.* at 20, 101, and the fact that he based his conclusion, in part, on the assumed existence of another, "authentic" Rio Nero (whereabouts unknown), render the plaintiffs' evidence too inconclusive to support its preponderance burden.

The remainder of the record and reasonable inferences therefrom weigh materially in favor of a finding of authenticity. The evidence here describes a mobile, demonstrably authentic when it left the hands of Calder's dealer, that has remained in the Bauman family since that time. The mobile's impeccable provenance is corroborated by an authentic invoice from Perls Galleries, creating, as all expert testimony in this case has confirmed, a strong presumption of authenticity. Palmer, a dealer experienced in the works of Calder, displayed the mobile from November 1989 through January 1990, apparently without reservations regarding its authenticity, and sought unsuccessfully to extend his consignment. Perls himself likely asked permission to sell the mobile for Bauman after inspecting the transparency in January 1990. It is more likely than not likely that when the mobile hung in the homes of Lionel and Patricia Bauman and in Palmer Gallery, it hung correctly and did not bump.

With respect to the mobile's condition, although there is no direct evidence in the record that plaintiffs actually damaged the mobile, circumstantial evidence makes it more likely than not that any variations or defects are attributable plaintiffs' handling after they paid for it and assumed the risks. Greenberg testified that when he received and inspected the mobile, it matched the transparency,[11] and upon hanging it, he told his co-owners it was "fabulous" and "beautiful." Upon examining it more than a year later, however, both experts volunteered that the mobile had been "hurt," had "had an accident" or otherwise been damaged. Plaintiffs had possession of the mobile for eight months, during which they shipped the mobile around the country several times. It

was manipulated, assembled, and reassembled repeatedly by Stoller, Morris, and Morris' son. To date, however, plaintiffs never have sought expert assistance in assembling the mobile.

On the other hand, plaintiffs, themselves experienced art dealers, have presented no evidence regarding how an "exact copy" of this complex mobile came to be formed or when and how it was substituted for the authentic Calder. Nor is there any evidence identifying the location of the real Rio Nero, if the mobile at issue here is in fact an exact copy. The record contains no evidence that there is a market for fake Calder mobiles or that another "exact copy" such as this one ever has been known to exist. Emmerich testified that he had never seen or heard of a Calder fake and never had heard of authentic documents being attached to an unauthentic work. He considered it highly unlikely that a Calder mobile could be accurately imitated, due to the engineering difficulties involved. Perls confirmed that replicating even parts of a Calder is "extremely difficult."

Entwistle cites the case of *Wilkinstein v. Wallace,* 756 F.Supp. 158, (S.D.N.Y.1991), as an instance where forgeries replaced authentic works of art in a private collection. In that case, the wife of an private art collector sold two of her husband's Monet paintings, unbeknownst to him, and replaced them with forgeries crafted in London. *Wilkinstein* differs crucially from the case presented here, however. In *Wilkinstein,* the facts established both a motive for the forgeries and a *corpus delicti.* In other words, the whereabouts of the authentic paintings was known, and their existence as a *corpus delicti* conclusively established that the other two paintings were forgeries. Here, as stated above, any such *corpus delicti* is conspicuously absent.

In light of all the evidence, therefore, I conclude that it is more likely than not that the mobile is not a forgery but the original Rio Nero which has been misassembled and abused to the point that, on a cursory examination, it does not exactly resemble the original photo and has lost the delicate balance

11. Perls agreed the mobile matches that in the transparency.

required for proper hanging. Because plaintiffs have not met their burden, judgment accordingly shall be entered for defendants on all counts.